# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

PATRICK CHAVEZ, et al,

       Plaintiffs,

v.                                                      No. CIV 02-562 JCH/ACT

CITY OF ALBUQUERQUE,

       Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER comes before the Court on a one-day bench trial commencing September 10, 2007. At trial, majority Plaintiffs were represented by Sam Bregman, Esq., minority Plaintiffs were represented by Paul Livingston, Esq., and Defendant City of Albuquerque ("City") was represented by Edward Bergmann, Esq., Michael Garcia, Esq., and Jerry Walz, Esq. At the close of Plaintiffs' case, the City moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 52(c), and the Court took that motion under advisement. After the conclusion of the trial, the parties submitted proposed supplemental findings of fact and conclusions of law, as well as written closing arguments. The Court, having considered the parties' submissions, as well as the evidence presented at trial and the relevant law, makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

I.     **Parties.**

     1.     Plaintiffs in this case are about 760 present and former City employees entitled to have their overtime wages calculated in accordance with the provisions of the Fair Labor

1

Standards Act (FLSA).

2.      The City of Albuquerque is a municipality and public employer that provides various services to its citizens through its employees.  A number of City employees are represented by labor unions and covered by union collective bargaining agreements ("CBAs"). These contracts establish various terms and conditions of employment.  Some of the terms and conditions of employment in the contracts exceed the overtime requirements of the FLSA.

II.     **City's Rules and Ordinances.**

3.      The City's Merit System Ordinance, § 3-1-11, provides that the City will pay overtime wages "for work performed outside of established work hours in accordance with the Fair Labor Standards Act."

4.      The City's Personnel Rule 302.2 provides that "when overtime is required for non-exempt employees, compensation must be in accordance with the Fair Labor Standards Act (FLSA) and any applicable collective bargaining agreement."

III.    **CBA Provisions.**

5.      The normal work week of most City employees is set out in their CBAs.  The normal work week for all employees except firefighters is 40 hours per week, consisting of five eight-hour days or four ten-hour days.

6.      The contracts between the Albuquerque Police Officers' Association ("APOA") and the City provide, under a caption titled, "Hours of Work and Overtime," that the "normal workday shall be eight (8) or ten (10) hours" and that "the normal workweek will be forty (40) hours" "comprised of either five (5) eight-hour or four (4) ten-hour days."  Under that same caption, the contracts also provide that "[e]mployees shall be entitled to overtime compensation at the rate of time-and-one-half their regular straight time rate when they perform work in excess

2

of forty hours in any one workweek" and that "for the purpose of computing overtime, paid leave shall be considered time worked, as per Section 34 (FLSA)."

7.    The contracts between the APOA and the City further state, under a separate caption titled, "Fair Labor Standards Act":

> Under the Fair Labor Standards Act paid leave is not considered time worked for the purpose of computing overtime and the *regular rate* for the purpose of computing overtime includes all remunerations.

> The parties thereto agree that for the purpose of computing overtime, paid leave will be considered time worked and the regular rate includes the hourly rate with no other remunerations included.  Under 7K of the FLSA, the parties agree that for the purpose of computing overtime, the pay schedule will be a 7 consecutive-day, 40-hour workweek.

> Applications of the FLSA as it pertains to the exempt status of positions will not change from current practice.

(Emphasis in originals).  The contracts also contain provisions under a caption titled, "PERA."

8.    The contracts between the APOA and the City provide for the sell back to the City of excess vacation and sick leave at the end of the year.  Specifically, the contracts provide that "[a]ll excess vacation accruals will be paid to the employee as monetary compensation at the end of the calendar year on an hour for hour basis."  The contracts further provide that "[a]ny sick leave accrued over the maximum [of 2000 hours] will automatically be converted to hazardous duty leave at the rate of two days of sick leave for one day of hazardous duty leave. . . . A police officer will receive one extra day of vacation every six (6) months, if that officer does not use any sick leave during the same six (6) month period."

9.    The contracts between the City and AFSCME, Local 624, provide that "[a]n employee's workweek shall consist of forty (40) hours per week, eight hours per day five

consecutive days a week or ten hours a day for four consecutive days a week." The contracts state that "[e]mployees shall be paid at the rate of time and one-half for all hours worked in excess of 40 hours per week. . . . For the purpose of computing overtime, paid leave will be considered time worked." This provision falls under a caption titled "Overtime," along with other provisions granting employees rights, many of which are not required by the FLSA. The contracts also contain provisions under a caption titled "P.E.R.A." The contracts do not contain any provisions under a caption titled "FLSA."

10.    The contracts between the Albuquerque Fire Fighters Association and the City provide that work schedules for the Fire Department will consist of (a) a 56-hour work week cycle of two consecutive 24-hour shifts and four days off; (b) a 42-hour work cycle of two ten-hour shifts and two fourteen-hour shifts and four days off; or (c) a 40-hour work week of four ten-hour shifts. In addition, the contracts provide, under a caption titled, "Work Hours and Overtime," (a) that overtime "shall be paid at time and one half the regular rate of pay;" (b) that "hours worked in excess of the employee's regular assigned shift will be compensated at the overtime rate of time and one half the regular rate of pay;" and (c) that "(t)ime spent in leave with pay status shall be considered time worked for purposes of computing overtime." The provisions under the caption titled "Work Hours and Overtime" grant employees rights, many of which are not required by the FLSA. The contracts also contain provisions under a caption titled "P.E.R.A." The contracts do not contain any provisions under a caption titled "FLSA."

11.    The contracts between the City and the Albuquerque Area Fire Fighters Union provide that if a fire fighter has accumulated sufficient vacation or sick leave (at the end of the year for sick leave and once per calendar year for vacation leave), that employee can sell back to the City his or her leave. Specifically, the CBAs provide that Fire Department employees "who

have accumulated over two years vacations [sic] may convert up to six (6) days over the two-year accumulation to cash payment once per calendar year."  With respect to sick leave, the CBAs provide that employees on a 56-hour workweek may sell back their leave as follows: "[f]or sick leave hours accumulated over 700 hours the employee may convert any or all such hours on the basis of 3 hours of sick leave for one hour's pay. . . .  For hours accumulated over 1008 hours on the basis of 2 hours of sick leave for one hour's pay. . . .  For hours accumulated over 1400 hours on the basis of 3 hours of sick leave for 2 hour's pay."  The contracts further provide that employees on a 40-hour workweek may sell back their leave as follows:  "[f]or sick leave hours accumulated over 500 hours the employee may convert any or all such hours on the basis of 3 hours of sick leave for one hour's pay. . . .  For hours accumulated over 720 hours on the basis of 2 hours of sick leave for one hour's pay. . . .  For hours accumulated over 1000 hours on the basis of 3 hours of sick leave for 2 hour's pay."  The contracts provide that employees on a 42-hour workweek may convert their leave as follows:  "[f]or sick leave hours accumulated over 525 hours the employee may convert any or all such hours on the basis of 3 hours of sick leave for one hour's pay. . . .  For hours accumulated over 756 hours on the basis of 2 hours of sick leave for one hour's pay. . . .  For hours accumulated over 1050 hours on the basis of 3 hours of sick leave for 2 hour's pay."

12.     The contracts between the City and AFSCME, Local 3022, provide, under a caption titled "Overtime," that "when overtime is required for non-exempt employees, compensation must be in accordance with the Fair Labor Standards Act (FLSA) and this Agreement.  Paid time will be considered hours worked for purposes of calculating overtime."  Other provisions under the "Overtime" caption refer to matters not addressed in the FLSA.  The contracts also contain provisions under captions titled "P.E.R.A." and "Family Medical Leave

Act." Although one of the "Overtime" provisions mentions the FLSA, the contracts do not contain any provisions under a caption titled "FLSA."

13.     The contracts between the City and AFSCME, Local 1888, provide, under a caption titled "Overtime," that "(f)or the purpose of computing overtime, paid leave will be considered time worked." The provisions in the "Overtime" section grant employees rights not given under the FLSA and address matters not contained in the FLSA. The contracts provide that "leave with pay is available for the following reasons: vacation, sickness, injury, emergencies, City business, jury duty, voting, annual military services, and education and leave with pay taken in conjunction with the F.M.L.A. policy." With respect to holidays, the Local 1888 contracts state that

> [e]mployees shall receive holiday pay at straight time at their hourly rate of pay for eight hours, for all holidays not worked. In the event that an Employee is required to work on a holiday and does not exercise an option to take a floating holiday, he/she shall be paid holiday pay at the rate mentioned above plus time and one half for all hours worked.

The contracts also contain provisions under captions titled "P.E.R.A." and "Family Leave." The contracts do not contain any provisions under a caption titled "FLSA."

14.     The contracts between the City and its clerical and technical employees, AFSCME, Local 2962, state, under a caption titled "Overtime," that "[e]mployees shall be paid at the rate of time and one-half (1-1/2) for all hours worked in excess of forty (40) hours per week" and that "(f)or the purpose of computing overtime, paid leave will be considered time worked." The contracts also state that "[e]mployees required to work on holidays will be paid regular holiday pay plus time and one-half (1-1/2) for the hours actually worked." The contracts also contain provisions under a caption titled "Family Medical Leave Act." The contracts do not

contain any provisions under a caption titled "FLSA."

15.     The contracts between the City and the New Mexico Transportation Union state under a caption titled "Overtime," that driver-employees "will be paid at the rate of time and one-half their regular hourly rate of pay for all hours worked in excess of 40 hours per week." The contracts do not contain a general provision indicating that for purposes of computing overtime paid leave will be considered time worked.  Rather, the contracts only state that the "Chairman of the Local Committee of Adjustments *may* count up to eight (8) hours per pay period of unpaid leave *for Union business* as time worked, for purposes of computing overtime under this Section," and that "[t]wo members of the Local [C]ommittee of Adjustments . . . *may* count up to four (4) hours of unpaid leave *for Union business* as time worked, for purposes of computing overtime under this section."  (Emphasis added.)  The contracts likewise do not contain any provisions under a caption titled "FLSA."

IV.     **Contractual Remunerations.**

16.     The CBAs generally require the City to compensate its employees for overtime beyond 40 hours of work per week, at the rate of exactly one and one-half times the base hourly rate.

17.     In addition to receiving regular and overtime pay, the CBAs require the City to pay certain employees additional types of pay, such as longevity, superlongevity, hazard, shift differential, assignment, fire certification, skill/assignment differential, bilingual, education, and firearms qualification (hereinafter referred to as "add-ons"), on a bi-weekly basis.

18.     The CBAs do not require the City to include these add-ons in its calculation of the contractual overtime rate.  In contrast, the FLSA requires inclusion of certain regularly-paid add-ons and non-discretionary bonuses in the calculation of the statutory overtime rate.

7

19.     Longevity pay is an extra amount of pay that the City regularly pays employees each pay period after a certain number of years of service as an incentive to encourage employees to continue their employment with the City.  Tr. at 21, ll. 13-16.  The parties do not dispute the fact that longevity pay must be included in calculating the "regular rate" of pay under the FLSA.

20.     The City regularly pays superlongevity pay each pay period to certain employees as another incentive to encourage continued employment.  Tr. at 22, ll. 11-16.  The parties do not dispute the fact that superlongevity pay must be included in calculating the "regular rate" of pay under the FLSA.

21.     The City regularly pays hazard pay to certain employees each pay period for performing hazardous duties.  For example, Tyron Morgan, employed by the Albuquerque Police Department, received an award of hazard pay for being assigned to motorcycle duty in the traffic unit of the Albuquerque Police Department.  Tr. at 20, ll. 23-25; Tr. at 21, ll. 1-4.  Officers assigned to hazardous classifications, such as pilots, bomb squad, aerial observer, and SWAT team, among others, also receive this type of hazard pay.  Pls' Exh. 7-A, § 32(B).  The parties do not dispute the fact that hazard pay must be included in calculating the "regular rate" of pay under the FLSA.

22.     The City regularly pays shift differential pay each pay period to employees working shifts other than the day shift.  Employees working swing shift, for example, regularly receive, while working that shift, a certain additional amount of pay, while employees working graveyard shift receive an even greater amount of shift differential pay while working that shift.  Tr. at 21, ll. 23-24; Tr. at 22, ll.1-3, 6.  The parties do not dispute the fact that shift differential pay must be included in calculating the "regular rate" of pay under the FLSA.

23.     The City regularly pays assignment differential pay (abbreviated on employee pay stubs as "assign pay") every pay period to Fire Department employees who are certified paramedics through the rank of Captain.  Pls' Exh. 4-A, § 28.  Likewise, the City pays employees of the Albuquerque Police Department "Special Skills Pay," for officers who have specialties such as polygraph examiners, field training officers, or area sergeant coordinators in certain areas.  Pls' Exh. 7-A, § 32(C).

24.     Plaintiff Patrick Chavez testified that in 1992 or 1993 he questioned the union why the City was not including his paramedic skill pay (now called assignment differential pay) in his overtime hourly rate of pay.  Tr. at 79 ll. 9-14.  Mr. Chavez indicated that union representatives informed him that they were going to look into his question and discuss it with him.  According to Mr. Chavez, the issue was not addressed or changed.  Tr. at 79 ll. 15-23.

25.     The City regularly pays assignment pay (abbreviated on employee pay stubs as "assignmt pay") each pay period to employees assigned to non-field positions with work weeks less than 56 hours.  Pls' Exh. 4-A, § 31.  The parties do not dispute the fact that assignment pay must be included in calculating the "regular rate" of pay under the FLSA.

26.     The City regularly awards "fire certificate" pay each pay period to fire fighter employees who are wild land certified at the arduous level.  Pls' Exh. 4-A, § 26(C).  The parties do not dispute the fact that fire certification pay must be included in calculating the "regular rate" of pay under the FLSA.

27.     Under the terms of certain collective bargaining agreements, employees of the Albuquerque Police and Fire Departments are able to sell their sick leave and vacation pay back to the City.  Tr. at 100, ll. 21-25; Tr. at 101, ll. 2-11.  The City of Albuquerque does not include this buy back in the calculation of the employees' overtime.  Tr. at 101, ll. 10-15; Tr. at 68, ll. 3-

11. Patrick Chavez also testified that when the City buys back excess leave, it simply gives its employees separate checks and does not include the buy back pay in their regular pay check. The payment therefore is not added to the pay stubs and is not included in calculating the "regular rate" under the FLSA.  The City does not include this type of pay in its calculation of the "regular rate" under the FLSA.  Tr. at 101, ll. 6-11 (testimony of Chappell).

V.    **Dual Calculation of Wages.**

28.    To determine the amount of wages owed to each employee during a given pay period, the City utilizes a dual method of pay calculation whereby it compares the employee's wage entitlements under the applicable CBA to the employee's wage entitlements under the FLSA.  The City pays pursuant to whichever calculation yields the greater amount for the employee.

29.    The City completes a dual calculation for each employee for each pay period, with the exception of employees the City categorizes as exempt from overtime pay under the FLSA and with the exception of police officers employed by the Albuquerque Police Department.  The City compensates these exempt employees solely pursuant to the terms of the applicable CBA.

30.    The CBAs provide for the payment of certain overtime premiums that are not required by the FLSA.  For example, certain CBAs require the payment of daily overtime and the payment of overtime on holidays.  The CBAs also establish a 40-hour overtime threshold and require the City to count hours paid but not worked towards the 40-hour threshold.  In contrast, the FLSA does not require employers to pay daily and holiday overtime, does allow employers to pay certain employees overtime after 43 hours instead of 40, and does not contain an explicit provision requiring employers to count hours paid as hours worked.

10

31.     Contractual overtime is calculated at one and one-half times the employee's base hourly rate.  The employee's base rate excludes add-ons (*e.g.*, longevity pay, superlongevity pay, hazardous duty pay, etc.).  In contrast, the FLSA requires the inclusion of certain regularly paid add-ons and nondiscretionary bonuses.

32.     Once the City calculates the employee's contractual overtime premium, the City determines whether the employee actually has worked the requisite hours during the workweek in question to be entitled to overtime pay under the FLSA.  The City does not include hours paid but not actually worked in determining whether the employee's hours exceed the statutory threshold.  If an employee's actual hours of work exceed 40 or if a fire protection and law enforcement employee's ratio of the number of hours worked to the number of days in the work period exceeds the applicable standard under Section 207(k) of the FLSA, the City calculates the employee's statutory overtime pay entitlement.

33.     If the City determines that an employee is entitled to overtime pay under the FLSA, and further determines that the FLSA pay exceeds the contractual pay, the City pays the employee an FLSA adjustment representing the difference between the contractual pay and the FLSA pay.  That adjustment is noted on the employee's pay stub as "FLSA OT Adj."  If the pay stub does not contain this one-line FLSA overtime adjustment, the City maintains that its payroll and human resources software, known as the Empath system, determined that contractual pay exceeded statutory pay for that particular employee.

34.     Although the City claims that it conducts a dual calculation for all non-exempt employees other than those employed by the Albuquerque Police Department, the City failed to present documentary evidence regarding the statutory calculation of wages for its employees. Laurice Chappell, accounting systems coordinator and acting payroll supervisor for the City of

Albuquerque, testified that she did not bring any of the back-up documentation to Court that shows the dual calculation the City maintains it performs for its employees.

35.    Although the City maintains that it completes an FLSA calculation at the time a paycheck is cut, Ms. Chappell testified that "[t]he many, many thousands and thousands and thousands of lines that it uses to do the calculation is not saved." Tr. at 131, ll. 7-12. Ms. Chappell, therefore, did not have "the individual line-by-line calculation that the system does." Tr. at 131, ll. 7-12.

36.    Ms. Chappell further testified that there presently are not specific documents within the City that reflect a dual calculation for each and every single employee over the last seven years, and that the City does not have the ability to produce such documents from its Empath system  Tr. at 148, ll. 8-13; Tr. at 127, ll. 18-24. Ms. Chappell could not obtain this documentation even for the last year. The calculations are "held in temporary buckets." Tr. at 149, ll. 4-7. The City therefore did not produce any dual calculations for the pay stubs in evidence. Tr. at 149-50, ll. 24-25 & 1-3.

37.    Although the City cannot produce the original calculations of each employee's FLSA pay, the City can obtain from its Empath system sufficient payroll information to recalculate an employee's FLSA pay. The Empath system can recall the day-by-day times that each employee worked for "probably four years." Tr. at 133, ll. 15-21 (testimony of Ms. Chappell).

38.    Ms. Chappell prepared, for purposes of litigation, a one-page replication of the process that the Empath system undertakes to compare the statutory wage to the FLSA wage. Tr. at 127, ll. 9-15; Def's Exh. B. The replication is a summary of the thousands of lines of calculations the Empath system performs as part of its dual calculation. Tr. at 131, ll. 7-12.

VI.    **Albuquerque Police Department Employees.**

39.    The City maintains that under the FLSA it is not required to pay its police officers statutory overtime until after 43 hours.  Tr. at 95, ll. 3-6; Tr. at 123, ll. 20.  The 43-hour FLSA work week is what historically has been in the payroll system and is the basis of the calculations Ms. Chappell has seen in the past.  Tr. at 103, ll. 13-15.  Ms. Chappell testified that she does not know whether the City has informed police officers that the City is using a 43-hour FLSA work week.  Tr. at 103, ll. 4-10.

40.    In contrast, the contracts between the City and the APOA call for police officers to get overtime after 40 hours.  Tr. at 143, ll. 17-19.  The contracts provide that "[u]nder 7K of the FLSA, the parties agree that for the purpose of computing overtime, the pay schedule will be a 7 consecutive-day, 40-hour workweek."  Merit Ordinance and Personnel Rules and Regulations, which are both part of the officers' contract with the City, also call for police officer overtime after 40 hours.  Tr. at 143, ll. 20-25; Tr. at 144, ll. 1-2.  Accordingly, the City pays police officers contractual overtime after 40 hours.

41.    Ms. Chappell testified that the City does not perform a dual calculation for police officers.  Tr. at 81, ll.16-21; *id.* at 97, ll. 12-18.  According to Ms. Chappell, because the City pays police officers overtime after 40 hours pursuant to their CBAs, "[t]he police are paid far above what the FLSA requires.  As long as [the City] pay[s] them correctly or overpays them, . . . [the City] need not do the actual calculation within the [Empath] system."  Tr. at 97, lls, 21-25.

42.    The Empath system does not include add-on pay such as longevity, hazard, or superlongevity pay, when it calculates police officers' overtime rate.  Tr. at 96, ll. 17-21; Tr. at 98, ll. 8-16; Tr. at 99, ll. 1-4.  Ms. Chappell testified that police officers never hit the point at which additional add-ons and bonuses are included because under their CBAs the officers are

13

paid overtime after 40 hours, rather than statutory overtime threshold of 43 hours. Tr. at 96, ll. 8-12. Accordingly, the City maintains that the Empath system need not include add-ons or other bonuses or conduct a comparison of statutory and contract wages. Tr. at 97, ll. 1-3.

43. Ms. Chappell explained that she periodically and informally monitors police officer contractual pay to make sure that it falls in excess of FLSA requirements. Tr. at 97, ll. 6-11; Tr. at 139, ll. 9-17. Ms. Chappell testified that on all of the City's tests, police officers have been overpaid beyond the FLSA requirements. Tr. at 99, ll. 13-19. At trial, the City did not provide evidence documenting the existence or results of any such tests.

44. Ms. Chappell admitted that if the City calculated police officer FLSA pay on a 40-hour work period, instead of a 43-hour work period, the change would increase the officers' pay. Tr. at 144, ll. 9-17. This is because the City would be required to consider add-ons and other non-discretionary bonuses in the calculation of the regular rate of pay--payments that the City presently does not consider because of the lower overtime threshold in the CBAs.

45. At trial, Plaintiffs presented evidence in the form of pay stubs from two Plaintiffs, Tyron Morgan, a current employee of the City of Albuquerque Police Department, and Todd Endres, a former employee of the City of Albuquerque Police Department.

46. Ms. Chappell testified that she could not calculate an employee's FLSA pay based upon the information contained in an employee's pay stub, because an FLSA calculation is based on a 40-hour workweek, and the pay stubs are bi-weekly. The pay stubs do not allocate hours of overtime or paid leave per week. Tr. at 122, ll. 17-25.

47. In addition to the two pay stubs, Plaintiffs also presented evidence of the wages the City paid to Mr. Morgan for the pay period ending July 6, 2007. The evidence was not admitted into evidence in the form of a pay stub. Rather, the City obtained the data contained in

Mr. Morgan's pay stub from the Empath system. The City can calculate Mr. Morgan's weekly FLSA pay from this information, because it includes time entries regarding the day-by-day hours that Mr. Morgan worked during that period. Pls' Exh. 12.

A.    **Tyron Morgan.**

48.    The first pay stub for Plaintiff Tyron Morgan for the pay period ending May 17, 2002, indicates that the City paid Mr. Morgan $23.08 in hazard pay, $126.03 in longevity pay, $11.54 in shift differential pay, and $34.62 in superlongevity pay for that bi-weekly pay period. Mr. Morgan's hazard, longevity, shift differential, and superlongevity pay for this period total $195.27 ($23.08 + $126.03 + $11.54 + $34.62 = $195.27).

49.    In that same pay period, Mr. Morgan received six hours of "comp" time at his hourly rate of $20.26, for a total of $121.56 in current compensatory time earnings, as well as 74 hours of "regular" pay at his hourly rate of $20.26, for a total regular pay of $1,499.24. Mr. Morgan also received 56 hours of overtime pay at the hourly rate of $30.39, which is exactly one and one-half times his hourly rate of $20.26, for a total of $1,701.84 in overtime "Tact Plan" pay for overtime spent on special operations plans within the traffic unit to do enhanced enforcement. Mr. Morgan further received two hours of overtime for "OT-Chief" pay, at the hourly rate of $24.25, for a total "OT-Chief" pay of $48.50, for working a chief's overtime assignment. Pls' Exh. 8; Tr. at 24, lls 20-24; Tr. at 25, ll. 20.

50.    Although the City paid Mr. Morgan $121.56 for six hours of compensatory time, Mr. Morgan did not actually work those six hours during this pay period. Rather, Mr. Morgan actually worked this overtime in a previous pay period, and he opted under his CBA to convert his (actual) overtime hours into compensatory time (to be taken as leave on a future date) at the rate of one and one-half times the hours actually worked in the previous pay period.

15

51.     The total number of hours compensated by Mr. Morgan during this pay period was 138 hours.  The total number of hours actually worked by Mr. Morgan during this pay period was 132 hours (138 hours compensated minus six hours of compensatory time = 132 hours actually worked).

52.     Mr. Morgan's pay stub indicates that the City paid Mr. Morgan $3,566.41 in gross earnings for this pay period. The City did not pay Mr. Morgan anything additional as an FLSA overtime adjustment.  This pay of $3,566.41 represents Mr. Morgan's contractual pay due under the relevant CBA.

53.     Nowhere on Mr. Morgan's pay stub for the period ending May 17, 2002, does it indicate that the City added Mr. Morgan's hazard, longevity, shift differential, or superlongevity pay into its calculation of Mr. Morgan's overtime pay rate.  Rather, the pay stub reflects that Mr. Morgan's hourly overtime rate of $30.39 was exactly one and one-half times his base hourly rate of $20.26.  Pls' Exh. 8; Tr. at 25, ll. 9-14.

54.     In computing FLSA overtime premiums, the first step is to determine the employee's "regular rate" of pay.  The "'regular rate' at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(c).

55.     The City concedes that shift differential pay, longevity pay, superlongevity pay, bilingual pay, educational pay, hazard pay, assignment pay, fire certificate pay, and firearms qualifications pay are all "bonuses" or "add-ons" subject to inclusion in the regular rate for purposes of the FLSA.

56.     To calculate the FLSA regular rate of pay based upon the numbers in Mr. Morgan's pay stub for the pay period ending May 17, 2002, an employer would multiply 132,

16

the number of actual hours of work for which Mr. Morgan was compensated,[1] by Mr. Morgan's regularly hourly rate of $20.26, and then add to that total his hazard, longevity, shift differential, and superlongevity pay, for a total of $2,869.59 (132 x $20.26 = $2,674.32 + $23.08 + $126.03 + $11.54 + $34.62 = $2,869.59). An employer would then divide $2,869.59 by the total number of hours actually worked, 132, to get the regular rate of pay of $21.74. The employer would then multiply that number by one and one-half to get the FLSA overtime rate of pay of $32.61.

57. The employer next would determine the number of hours for which Mr. Morgan would be entitled to statutory overtime pay. Assuming a Section 207(k) work week applies, Mr. Morgan would be entitled to 46 hours of statutory overtime (132 hours actually worked[2] in two

---

[1] Although the City paid Mr. Morgan for 138 hours, only 132 of those hours were actually worked. Specifically, the City paid Mr. Morgan for six hours of compensatory time at his regular hourly rate of $20.26, for a total of $121.56 in wages for that compensatory time. The CBAs for police officers provide that "[t]ime worked over 40 hours per week will be compensated at 1 ½ times the officer's regular rate of pay, or in the form of compensatory time. Compensatory time will be computed at the rate of 1 ½ times the hours actually worked. The maximum accrual of comp time for any officer . . . is 200 hours." Although the City paid Mr. Morgan $121.56 for six hours of compensatory time, Mr. Morgan did not actually work those six hours. Rather, Mr. Morgan (actually) worked overtime hours in a previous pay period, and he opted under his CBA to convert his (actual) overtime hours into compensatory time (to be taken as leave on a future date) at the rate of one and one-half times the hours actually worked.

Section 207(e) contains a list of remunerations that the regular rate "shall not be deemed to include." This compendium encompasses such things as "payments made for occasional periods when no work is being performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause." 29 U.S.C. § 207(e)(1)-(2). These exclusions (and the statutory language used in their explication) illustrate that any compensation that is not paid for hours actually worked in the service and at the gain of the employer is not to be counted toward hours of service in calculating the "regular rate." *Plumley v. S. Container, Inc.*, 303 F.3d 364, 370 (1st Cir. 2002).

[2] In calculating Mr. Morgan's FLSA wages, the Court has not counted his six hours of compensatory time towards the 43-hour overtime threshold under Section 207(k). The Court already has concluded that only hours actually worked count towards statutory overtime thresholds. Because Mr. Morgan did not actually work six hours during the pay period in question, but rather worked four hours during an earlier pay period (which hours were converted at the rate of one and one-half times the hours worked into compensatory time for future use),

17

weeks minus 86 straight time hours (43 straight time hours for each week) = 46 overtime hours).

The employer would multiply the FLSA overtime rate of $32.61 by 46 hours, for a total overtime

pay of $1,500.06.  The employer would then multiply the 86 straight time hours by the FLSA

regular rate of $21.74, for a total straight time pay of $1,869.64.  The employer would then add

the FLSA overtime and straight time wages to the compensatory pay wages of $121.56, for a

total FLSA pay of $3,491.26.

58.    The FLSA pay of $3,491.26 is $75.15 less than the contractual gross earnings of

$3,566.41 that the City paid Mr. Morgan.

59.    Plaintiffs also presented information obtained from the Empath system regarding

Mr. Morgan's wages for the pay period ending July 6, 2007, and the hours that Mr. Morgan

worked each day during this pay period.  The documentation regarding this pay period indicates

that the City paid Mr. Morgan $62.31 in incentive pay, $50.00 in "INC Pay -Field Training

Offcr," $288.82 in longevity pay, $23.08 in shift differential pay, and $34.62 in superlongevity

pay.  Mr. Morgan's incentive, field training officer, longevity, shift differential, and

superlongevity pay for one week would be $229.42 ($62.31 + $50.00 + 288.82 + $23.08 +

$34.62 = $458.83/2 = $229.42).  Pls' Exh. 12.

60.    In that same pay period, Mr. Morgan received 80 hours of "regular" pay at his

hourly rate of $25.60, for a total regular pay of $2,048.00.  Mr. Morgan further received twelve

hours of overtime at the hourly rate of $38.40, which is exactly one and one-half times his hourly

rate of $25.60, for a total overtime pay of $460.80.  In addition, Mr. Morgan received eight hours

of holiday overtime at the rate of $38.40, for a total of $307.20 in holiday overtime.  Pls' Exh.

those hours do not count towards the 43-hour overtime threshold.

18

12.

61.    The total number of hours compensated by Mr. Morgan during this pay period was 100 hours.  The total number of hours actually worked by Mr. Morgan during this pay period was 100.  The day-to-day time entries indicate that Mr. Morgan actually worked 46 hours during week one and 54 hours during week two.

62.    The Empath documentation indicates that the City paid Mr. Morgan $3,274.83 in gross earnings for this pay period.  The City maintains that it calculated Mr. Morgan's FLSA pay for this pay period, and that his FLSA pay did not exceed his contractual pay.  Accordingly to the City, the $3,274.83 in gross wages represents Mr. Morgan's contractual pay.

63.    The City did not add Mr. Morgan's incentive, field training officer, longevity, shift differential, or superlongevity pay into its calculation of Mr. Morgan's overtime pay rate.  Rather, Mr. Morgan's overtime rate of $38.40 was at a rate exactly one and one-half times his hourly rate of $25.60.  Pls' Exh. 12.

64.    To calculate the FLSA regular rate of pay based upon the Empath documentation for week one of Mr. Morgan's pay period ending July 6, 2007, an employer would multiply the number of hours for which Mr. Morgan actually worked by Mr. Morgan's regularly hourly rate of $25.60, and then add to that total his longevity, shift differential, and superlongevity pay, for a total of $1,407.02 (46 x $25.60 = $1,177.60 + ($288.82 + $62.31 + $50.00 + $23.08 + $34.62 = $458.83 / 2 = $229.42) = $1,407.02).  An employer would then divide that total by the total number of hours actually worked to get the regular rate of pay of $30.59.  The employer would then multiply that number by one and one-half to get the FLSA overtime rate of pay of $45.88.

65.    The employer next would determine the number of hours for which Mr. Morgan would be entitled to statutory overtime pay, which, for this pay period, assuming a Section

19

207(k) work week, would be three hours of FLSA overtime (46 hours actually worked minus 43 hours of straight time pursuant to Section 207(k) = 3 FLSA overtime hours), which the employer would multiply by the FLSA overtime rate of $45.88, for a total FLSA overtime pay of $137.64. The employer would then multiply the 43 straight time hours by the FLSA regular rate of $30.59, for a total straight time pay of $1,315.37.  The employer would then add the FLSA overtime and straight time wages for a total FLSA pay for week one of $1,453.01.

66.     To calculate the FLSA regular rate of pay based upon the Empath documentation for week two of Mr. Morgan's pay period ending July 6, 2007, an employer would multiply the number of hours for which Mr. Morgan actually worked by Mr. Morgan's regularly hourly rate of $25.60, and then add to that total his longevity, shift differential, and superlongevity pay, for a total of $1,407.02 (54 x $25.60 = $1,382.40 + $229.42 = $1,611.82).  An employer would then divide that total by the total number of hours actually worked to get the regular rate of pay of $29.85.  The employer would then multiply that number by one and one-half to get the FLSA overtime rate of $44.77.

67.     The employer next would determine the number of hours for which Mr. Morgan would be entitled to statutory overtime pay, which, for this pay period, assuming a Section 207(k) work week, would be eleven hours of FLSA overtime (54 hours actually worked minus 43 hours of straight time pursuant to Section 207(k) = 11 FLSA overtime hours), which the employer would multiply by the FLSA overtime rate of $44.77, for a total FLSA overtime pay of $492.47.  The employer would then multiply the 43 straight time hours by the FLSA regular rate of $29.85, for a total straight time pay of $1,283.55.  The employer would then add the FLSA overtime and straight time wages for a total FLSA pay for week two of $1,776.02.

68.     The sum of the FLSA pay from weeks one and two is $3,229.03, which is $45.80

20

less than the $3,274.83 in contractual gross earnings the City paid Mr. Morgan.

B.    **Todd Endres.**

69.    The pay stub for Plaintiff Todd Endres, for the pay period ending December 15, 2000, indicates that the City paid Mr. Endres $128.34 in longevity pay, $23.08 in shift differential pay, and $34.62 in superlongevity pay. Pls' Exh. 9. Mr. Endres's longevity, shift differential, and superlongevity pay totals $186.04 ($128.34 + $23.08 + $34.62 = $186.04).

70.    In that same pay period, Mr. Endres received ten hours of "comp" time at his hourly rate of $19.86, for a total of $198.60 in current compensatory time earnings, as well as 70 hours of "regular" pay at his hourly rate of $19.86, for a total regular pay of $1,390.20. Mr. Endres also received 22 hours of overtime at the hourly rate of $29.79, which is exactly one and one-half times his hourly rate of $19.86, for a total of $655.38 in overtime "Metro CT" for time spent at the Metropolitan Court. Mr. Endres further received four and one-half hours of overtime for "OT Tact Plan" pay, for overtime spent on special operations plans within the traffic unit to do enhanced enforcement, at the hourly rate of $29.79, for a total "OT Tact Plan" pay of $134.06. Pls' Exh. 9.

71.    Although the City paid Mr. Endres $198.60 for ten hours of compensatory time, Mr. Endres did not actually work those ten hours during this pay period.

72.    The total number of hours compensated by Mr. Endres during this pay period was 106.50 hours. The total number of hours actually worked by Mr. Endres during this pay period was 96.50 hours (106.50 hours compensated minus ten hours of compensatory time = 96.50 hours actually worked). Pls' Exh. 9.

73.    Mr. Endres's pay stub indicates that the City paid Mr. Endres $2,564.28 in gross earnings for this pay period. The City did not pay Mr. Endres anything additional as an FLSA

overtime adjustment. This $2,564.28 in pay represents Mr. Endres's contractual pay due under the relevant CBA. Pls' Exh. 9.

74.     Nowhere on Mr. Endres's pay stub for the period ending December 15, 2000, does it indicate that the City added Mr. Endres's longevity, shift differential, or superlongevity pay into its calculation of Mr. Endres's overtime pay rate. Rather, the pay stub indicates that Mr. Endres's overtime rate of $29.79 was at a rate exactly one and one-half times his hourly rate of $19.86. Pls' Exh. 9.

75.     The City paid Mr. Endres $2,564.28 in gross earnings for this pay period. Because the City concedes that it did not conduct an FLSA calculation of Mr. Endres's pay, this pay represents Mr. Endres's contractual pay due under the relevant CBA.

76.     To calculate the FLSA regular rate of pay based upon the numbers in Mr. Endres's pay stub for the period ending December 15, 2000, an employer would multiply the number of hours for which Mr. Endres actually worked by Mr. Endres's regularly hourly rate of $19.86, and then add to that total his longevity, shift differential, and superlongevity pay, for a total of $2,102.53 (96.5 x 19.86 = $1,916.49 + $128.34 + $23.08 + $34.62 = $2,102.53). An employer would then divide that total by the total number of hours actually worked to get the regular rate of pay of $21.79. The employer would then multiply that number by one and one-half to get the FLSA overtime rate of pay of $32.68.

77.     The employer next would determine the number of hours for which Mr. Endres would be entitled to statutory overtime pay. Mr. Endres would be entitled to ten and one-half overtime hours (96.5 hours actually worked minus 86 straight time hours (assuming a Section 207(k) work week) = 10.5 FLSA overtime hours), which the employer would multiply by the FLSA overtime rate of $32.68, for a total FLSA overtime pay of $343.14. The employer would

then multiply the 86 straight time hours by the FLSA regular rate of $21.79, for a total straight

time pay of $1,873.94.  The employer would then add the FLSA overtime and straight time

wages to the compensatory pay wages of $198.60, for a total FLSA pay of $2,415.68.

78.    The FLSA pay of $2,415.68 is $148.60 less than the $2,564.28 in contractual

gross earnings that the City paid Mr. Endres.

VII.    **Albuquerque Fire Department Employees**.

79.    Ms. Chappell testified that the FLSA pay period for the Albuquerque Fire

Department is a 24-day, 182-hour period.  Tr. at 123, ll. 23.  The City uses this 24-day, 182-hour

pay period to calculate FLSA pay for Fire Department non-exempt employees.  Tr. at 124, ll. 2-

9.

80.    The pay stub for Plaintiff Patrick Chavez, a lieutenant with the City of

Albuquerque Fire Department, for the pay period ending June 8, 2007, indicates that the City

paid Mr. Chavez $84.00 in "Assign Pay," $50.00 in assignment pay, $15.00 for his fire

certificate, $129.35 in longevity pay, and $25.00 in superlongevity pay.  Pls' Exh. 11.  Mr.

Chavez's assignment differential, assignment, fire certificate, longevity, and superlongevity pay

totals $303.35 ($84.00 + $50.00 + $15.00 + $129.35 + $25.00 = $303.35).

81.    In addition, the City paid Mr. Chavez $49.22 in "Out Step Ln" pay.  Plaintiffs do

not maintain that this pay should be included in the calculation of the FLSA regular rate of pay.

Pls' Exh. 11.

82.    In that same pay period, Mr. Chavez received 75.6 hours of "regular" pay at his

hourly rate of $24.38, for a total regular pay of $1,843.13.  Mr. Chavez further received 34 hours

of overtime at the hourly rate of $36.57, which is exactly one and one-half times his hourly rate

of $24.38, for a total overtime pay of $1,243.38.  In addition, Mr. Chavez received eight and

four-tenths hours of holiday overtime at the rate of $36.57, for a total of $307.19 in holiday overtime pay.  The City also paid Mr. Chavez for eight and four-tenths hours of paid holiday leave at the rate of $24.38, for a total of $204.79.  Pls' Exh. 11.

83.    Although the City paid Mr. Chavez $204.79 for eight and four-tenths hours of holiday leave, Mr. Chavez did not actually work those eight and four-tenths hours during this pay period.

84.    The total number of hours compensated by Mr. Chavez during this pay period was 126.4 hours.  The total number of hours actually worked by Mr. Chavez during this pay period was 118 hours (126.4 - 8.4 = 118 hours actually worked).  Pls's Exh. 11.

85.    Mr. Chavez's pay stub indicates that the City paid Mr. Chavez $3,951.06 in gross earnings for this pay period.  The $3,951.06 in pay represents Mr. Chavez's contractual pay due under the relevant CBA.  Pls' Exh. 11.

86.    Nowhere on Mr. Chavez's pay stub for the period ending June 8, 2007, does it indicate that the City added Mr. Chavez's assign, assignment, fire certificate, longevity, or superlongevity pay into its calculation of Mr. Chavez's overtime pay rate.  Rather, the pay stub indicates that Mr. Chavez's hourly overtime rate of $36.57 was at a rate exactly one and one-half times his hourly rate of $24.38.  Pls' Exh. 11.

87.    Ms. Chappell testified that the City of Albuquerque did not include any of Patrick Chavez's assignment, fire certification, longevity, or superlongevity pay into his overtime rate because the City considers Mr. Chavez exempt.  Tr. at 100, ll. 2-6.

88.    On summary judgment, however, the Court granted Plaintiffs' motion for summary judgment in their favor on the defense of exempt status.  *See* Mem. Op. & Order, at 43 [Doc. 250].  Accordingly, the defense of exempt status has been decided against the City as a

24

matter of law and is no longer available to the City.

89.     To calculate the FLSA regular rate of pay based upon the numbers in Mr. Chavez's pay stub for the period ending June 8, 2007, an employer would multiply 118, the number of hours actually worked, by Mr. Chavez's regularly hourly rate of $24.38, and then add to that total his assignment differential, assignment, fire certificate, longevity, and superlongevity pay, for a total of $3,180.19 (118 x $24.38 = $2,876.84 + $84.00 + $50.00 + $15.00 + $129.35 + $25.00  = $3,180.19).  An employer would then divide $3,180.19 by the total number of hours actually worked, 118, to get the regular rate of pay of $26.95.  The employer would then multiply that number by one and one-half to get the FLSA overtime rate of pay of $40.43.

90.     The employer next would determine the number of hours for which Mr. Chavez would be entitled to statutory overtime pay.  Mr. Chavez would be entitled to 38 overtime hours (118 hours actually worked minus 80 straight time hours (assuming Section 207(a) applies) = 38 FLSA overtime hours), which the employer would multiply by the FLSA overtime rate of $40.43, for a total FLSA overtime pay of $1,536.34.  The employer would then multiply the 80 straight time hours by the FLSA regular rate of $26.95, for a total straight time pay of $2,156.00. The employer would then add the FLSA overtime and straight time wages to the eight and four-tenths hours of vacation pay wages of $204.79 and the "Out Step Ln" pay of $49.22, for a total FLSA pay of $3,946.35.

91.     The FLSA pay of $3,946.35 is $4.71 less than the $3,951.06 in contractual gross earnings the City paid Mr. Chavez.

VIII.   **Other Employees.**

92.     The City also presented evidence of the City's payment of Alvin Cartwright, a

former corrections officer with the City.

93.    Plaintiffs submitted into evidence a pay stub for Mr. Cartwright for the pay period ending May 17, 2002. The pay stub indicates that the City paid Mr. Cartwright $37.31 in longevity pay. Pls' Exh. 10. In addition, the City paid Mr. Cartwright $23.08 in "Clothing" pay. Plaintiffs do not maintain that clothing pay should be included in the calculation of the FLSA regular rate of pay. Pls' Exh. 10.

94.    In that same pay period, Mr. Cartwright received 72 hours of "regular" pay at his hourly rate of $15.00, for a total regular pay of $1,080.00. Mr. Cartwright further received 20.50 hours of overtime at the hourly rate of $22.50, which is exactly one and one-half times his hourly rate of $15.00, for a total overtime pay of $461.25. In addition, Mr. Cartwright received eight hours of vacation pay at $15.00 per hour, for a total of $120.00 in paid vacation. Pls' Exh. 10.

95.    Although the City paid Mr. Cartwright $120.00 for eight hours of vacation leave, Mr. Cartwright did not actually work those eight hours during this pay period.

96.    The total number of hours compensated by Mr. Cartwright during this pay period was 100.5 hours. The total number of hours actually worked by Mr. Cartwright during this pay period was 92.5 hours (100.5 - 8 = 92.5 hours actually worked).

97.    Mr. Cartwright's pay stub indicates that the City paid Mr. Cartwright $1,724.91 in gross earnings for this pay period.

98.    Nowhere on Mr. Cartwright's pay stub for the period ending May 17, 2002, does it indicate that the City added Mr. Cartwright's longevity pay into its calculation of his overtime pay rate. Rather, the pay stub indicates that Mr. Cartwright's hourly overtime rate of $22.50 was at a rate exactly one and one-half times his hourly rate of $15.00. Pls' Exh. 10.

99.    Mr. Cartwright's pay stub indicates that by the City's calculations, his FLSA pay

26

exceeded his contractual pay.  The pay stub contains a one-line "FLSA OT Adj" of $3.27, which indicates that the City believed Mr. Cartwright's FLSA pay was $3.27 greater than the pay he was entitled to under his contract.

100.    To calculate the FLSA regular rate of pay based upon the numbers in Mr. Cartwright's pay stub, an employer would multiply 92.5, the number of hours actually worked, by Mr. Cartwright's regularly hourly rate of $15.00, and then add to that total his longevity pay, for a total of $1,424.81 (92.5 x $15.00 = $1,387.50 + $37.31 = $1,424.81).  An employer would then divide $1,424.81 by the total number of hours actually worked, 92.5, to get the regular rate of pay of $15.40.  The employer would then multiply that number by one and one-half to get the FLSA overtime rate of pay of $23.11.

101.    The employer next would determine the number of hours for which Mr. Cartwright would be entitled to statutory overtime pay.  Mr. Cartwright actually worked 92.5 hours, and would be entitled to twelve and one-half overtime hours pursuant to Section 207(a) (92.5 hours actually worked minus 80 straight time hours under Section 207(a) = 12.5 FLSA overtime hours), which the employer would multiply by the FLSA overtime rate of $23.11, for a total FLSA overtime pay of $288.88.  The employer would then multiply the 80 straight time hours by the FLSA regular rate of $15.40, for a total straight time pay of $1,232.00.  The employer would then add the FLSA overtime and straight time wages to the eight hours of vacation pay wages of $120.00 and the "clothing" pay of $23.08, for a total FLSA pay of $1,663.96.

102.    The FLSA pay of $1,663.96 is $57.68 less than the $1,721.64 in contractual gross earnings the City paid Mr. Cartwright for this pay period.

103.    In addition, the City presented evidence of Alvin Cartwright's pay stub

information from the pay period June 25, 2005, to July 8, 2005, as well as time entries regarding

the day-by-day hours that Mr. Cartwright worked during that period.  From this evidence, the

City can calculate Mr. Cartwright's weekly, as opposed to bi-weekly, FLSA pay.  Def's Exh. B;

Tr. at 133-34.  Ms. Chappell obtained this information from the Empath system.  Tr. at 130, ll.

13-17 (testimony of Chappell).

 104. The documentation regarding this pay period indicates that the City paid Mr.

Cartwright $41.92 in longevity pay for that bi-weekly pay period.  Def's Exh. B.  Allocated by

week, the City paid Mr. Cartwright $20.96.

 105. The documentation also indicates that the City paid Mr. Cartwright $23.08 in a

clothing allowance.  Plaintiffs do not appear to maintain that the clothing allowance should be

included in the City's calculation of Mr. Cartwright's FLSA "regular rate" of pay.  Def's Exh. B.

 106. In week one of this pay period, the City paid Mr. Cartwright 40 hours of vacation

pay at his regular hourly rate of $15.00, for a total vacation pay of $600.00.

 107. The total number of hours compensated in week one was 40.  The total number of

hours worked in week one was zero.

 108. In week two of this pay period, the City paid Mr. Cartwright 40 hours of

"regular" pay at his hourly rate of $15.00, for a total regular pay of $600.00.  The City also paid

Mr. Cartwright 40 hours of overtime at the hourly rate of $22.50, which is exactly one and one-

half times his hourly rate of $15.00, for a total overtime pay of $900.00.  In addition, the City

paid Mr. Cartwright eight hours of holiday overtime at the rate of $22.50, for a total of $180.00

in holiday overtime.  The City also paid Mr. Cartwright $5.92 for an "FLSA Overtime Adjust

(Non-Fire)."  Def's Exh. B.

 109. The total number of hours compensated by the City in week two was 88.  The

total number of hours actually worked by Mr. Cartwright in week two was 88.

110.    The Empath documentation indicates that the City paid Mr. Cartwright $2,350.92 in gross earnings for this pay period.  The documentation indicates that by the City's calculations, Mr. Cartwright's FLSA pay exceeded his contractual pay.  The City therefore paid Mr. Cartwright an FLSA adjustment of $5.92 for that pay period.

111.    The City did not add Mr. Cartwright's longevity pay into its calculation of Mr. Cartwright's overtime pay rate.  Rather,  Mr. Cartwright's overtime rate of $22.50 was at a rate exactly one and one-half times his hourly rate of $15.00.  Def's Exh. B.

112.    Because Mr. Cartwright did not work overtime in week one (rather, he took 40 hours of vacation pay), the Court need not compare FLSA pay to contract pay for that week.

113.    To calculate the FLSA regular rate of pay based upon the numbers in the Empath documentation for week two of the pay period ending July 8, 2005, an employer would multiply 88, the number of hours actually worked, by Mr. Cartwright's regularly hourly rate of $15.00, and then add to that total his weekly longevity pay, for a total of $1,361.92 (88 x $15.00  = $1,320.00 + $20.96 = $1,340.96.  An employer would then divide $1,361.92 by the total number of hours actually worked, 88, to get the regular rate of pay of $15.24.  The employer would then multiply that number by one and one-half to get the FLSA overtime rate of $22.86.

114.    The employer next would determine the number of hours for which Mr. Cartwright would be entitled to statutory overtime pay.  Mr. Cartwright actually worked 88 hours, and would be entitled to 48 overtime hours pursuant to Section 207(a) (88 hours actually worked minus 40 straight time hours under Section 207(a) = 48 FLSA overtime hours), which the employer would multiply by the FLSA overtime rate of $22.86, for a total FLSA overtime pay of $1,097.28.  The employer would then multiply the 40 straight time hours by the FLSA

regular rate of $15.24, for a total straight time pay of $609.60. The employer would then add the FLSA overtime and straight time wages to the 40 hours of vacation pay wages of $600.00 (from week one) and the "clothing" allowance of $23.08, for a total FLSA pay of $2,329.96 for weeks one and two.

115.    The FLSA pay of $2,329.96 is $15.04 less than the contractual gross earnings of $2,345.00 that the City paid Mr. Cartwright for this pay period.

## LEGAL ANALYSIS AND CONCLUSIONS OF LAW

At trial, the following questions were presented to the Court: (1) whether the City properly includes all regularly-paid, nondiscretionary bonuses and add-ons in its calculation of the "regular rate" of pay, and (2) whether the City properly credits payments against its FLSA overtime liabilities. The Court addresses each of these questions in turn.

I.    **Inclusion of Add-Ons and Non-Discretionary Bonuses in the FLSA "Regular Rate."**

A.    **The Law: "Regular Rate" vs. Overtime Hours Threshold.**

With respect to the first question, the City argues that, where no add-on was included or where no line item labeled FLSA overtime adjustment appeared, contractual pay exceeded statutory pay and therefore the employee was not paid pursuant to the FLSA. Although the City claims that it makes a separate FLSA calculation for each employee, with the exception of police officers, the City admits that its FLSA calculations are not documented on its employees' pay stubs, and that the back up figures for the FLSA calculations are not kept in the City's records. Rather, the only indication that FLSA pay for any given employee exceeds contractual pay is a one-line item FLSA adjustment on the employee's pay stub, paying the employee the alleged difference between the FLSA pay and contractual pay.

In contrast, Plaintiffs argue that the City does not include the required add-ons and non-

discretionary bonuses in its FLSA calculation for its employees. Plaintiffs maintain that the City interprets the CBAs as allowing calculation of overtime payments using a regular rate that does not include the required add-ons and remunerations.

As a threshold matter, the Court concludes that because this case arises under the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 *et seq.*, the Court has federal question jurisdiction over the subject matter herein pursuant to 28 U.S.C. Section 1331. The Court also concludes that it has personal jurisdiction over the parties hereto and that venue is proper in this Court.

Section 207(a) of the FLSA provides in pertinent part, "Except as otherwise provided in this section, no employer shall employ any employee who in any work week is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce, or in the production of goods for commerce, ***for a work week longer than 40 hours*** unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the ***regular rate*** at which he is employed." 29 U.S.C. § 207(a)(1) (emphasis added). Alternatively, Section 207(k) allows a state or local government, in its employment of law enforcement or fire protection personnel, to adopt an alternative scheme available under Section 207(k), under which an employer may choose to pay its law enforcement or fire protection employees overtime for a work week longer than 43 hours instead of 40 hours. *O'Brien v. Town of Agawam*, 350 F.3d 279, 290 (1st Cir. 2003) (citing 29 U.S.C. § 207(k) and 29 C.F.R. §§ 553.230(b), (c)).

Which *hours* count for purposes of reaching the applicable FLSA overtime hours threshold is a separate and distinct question from what *pay* is counted in calculating the FLSA "regular rate." In its Memorandum Opinion and Order, dated August 10, 2007, the Court

31

concluded that the City must look to the CBAs to determine what *pay* is included in calculating the FLSA "regular rate."  The Court did not decide, however, the separate and distinct issue of whether the City must look to the CBAs to determine what *hours* count towards reaching the FLSA overtime threshold of 40 or 43 hours.

The case law the Court cited in its Memorandum Opinion and Order in support of its conclusion that the City must look to the CBAs to calculate the "regular rate" does not stand for the proposition that the City must look to the CBAs to determine what *hours* are counted towards reaching the FLSA overtime hour threshold.  To the contrary, those cases specifically hold that employers must look to the employment contract to determine what *pay* shall be included in the calculation of the "regular rate" under the FLSA.  *Cf.   Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 425-26 (1945) (looking to the employment contracts to determine the hourly rate actually paid for the normal, non-overtime workweek, *i.e.*, to determine the FLSA regular rate of pay, for purposes of calculating overtime under the FLSA); *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 452, 460 (1948) (looking to the collective bargaining agreement to determine the pay included in the "regular rate" for FLSA purposes); *O'Brien v. Town of Agawam*, 350 F.3d 279, 294 (1st Cir. 2003) (explaining that "[u]nder [Section 207(e)] and the relevant case law and interpretive regulations, the regular rate . . . must be discerned from what actually happens under the governing employment contract," and including CBA "contractually guaranteed shift-differential pay, longevity pay, and career-incentive . . . pay in the officers' 'regular rate' for purposes of overtime calculation under the FLSA"); *Aaron v. City of Wichita*, 54 F.3d 652, 655 (10th Cir. 1995) (the "regular rate" is what an employer "actually paid to the employee for the normal, non-overtime workweek"); *Wheeler v. Hampton Township*, 399 F.3d 238, 244 (3d Cir. 2005) (looking to the CBA to determine whether non-work *pay* should be

included in the calculation of the "regular rate" under the FLSA, and including *pay* for hours not

work in the regular rate calculation).  Plaintiffs cite no case law that stands for the proposition

that the City must look to the CBAs to determine what hours to count toward the 40-hour FLSA

threshold, and the Court finds none.

Regulations established by the Department of Labor, however, do provide guidance.

Although agency interpretive regulations are generally not binding on courts, *see Batterton v.*

*Francis*, 432 U.S. 416, 425 n.9 (1977); *O'Brien*, 350 F.3d at 287 n.15, such interpretations are

entitled to judicial deference, *Nolan v. City of Chicago*, 125 F. Supp. 2d 324, 335 (D. Ill. 2000).

Indeed, the Tenth Circuit has explicitly recognized that the "administrative regulations adopted

pursuant to FLSA 'are entitled to great weight and should not lightly be set aside.' . . .  FLSA

regulations 'constitute a body of experience and informed judgment to which courts and litigants

may properly resort for guidance.'"  *Lamon v. City of Shawnee*, 972 F.2d 1145, 1152 n.7 (10th

Cir. 1992) (citations and internal quotations omitted); *see also O'Brien*, 350 F.3d at 298.

Section 778.101 of Title 29 of the Code of Federal Regulations provides support for the

conclusion that the overtime hours threshold is not determined by contractual provisions but by

hours actually worked.  Section 778.101 provides,

> As a general standard, section 7(a) of the Act provides 40 hours as
> the maximum number that an employee subject to its provisions
> may work for an employer in any workweek without receiving
> additional compensation at not less than the statutory rate for
> overtime.  *Hours worked in excess of the statutory maximum in*
> *any workweek are overtime hours under the statute; a workweek*
> *no longer than the prescribed maximum is a nonovertime*
> *workweek under the Act, to which the pay requirements of section*
> *6 (minimum wage and equal pay) but not those of section 7(a) are*
> *applicable.*

29 C.F.R. § 778.101 (emphasis added).  Section 778.101 explicitly provides that only "[h]ours

worked in excess of the statutory maximum in any workweek" are "overtime hours under the statute," and that "a workweek no longer than the prescribed maximum is a nonovertime workweek." The "prescribed" maximum is, by definition, the 40-hour maximum (applicable to employees other than those engaged in law enforcement or fire prevention covered by Section 207(k)) set forth in the statute. The prescribed maximum is not determined with reference to the provisions of the CBAs. Accordingly, when an employee has not worked in excess of 40 hours in one week, the overtime pay requirements of the FLSA are inapplicable.

Section 778.102 of Title 29 also provides support for the conclusion that only hours actually worked are counted towards the statutory overtime threshold. Section 778.102 provides,

> Since there is no absolute limitation in the Act (apart from the child labor provisions and regulations thereunder) on the number of hours that an employee may work in any workweek, he may work as many hours a week as he and his employer see fit, so long as the required overtime compensation is paid him for hours worked in excess of the maximum workweek prescribed by section 7(a). *The Act does not generally require, however, that an employee be paid overtime compensation for hours in excess of eight per day, or for work on Saturdays, Sundays, holidays or regular days of rest. If no more than the maximum number of hours prescribed in the Act are actually worked in the workweek, overtime compensation pursuant to section 7(a) need not be paid.* Nothing in the Act, however, will relieve an employer of any obligation he may have assumed by contract or of any obligation imposed by other Federal or State law to limit overtime hours of work or to pay premium rates for work in excess of a daily standard or for work on Saturdays, Sundays, holidays, or other periods outside of or in excess of the normal or regular workweek or workday.

29 C.F.R. § 778.102 (emphasis added). Section 778.102 implicitly addresses a situation in which an employer may have agreed to count certain hours paid but not "actually worked" by an employee in calculating overtime due, and suggests that obligations under the FLSA are distinct from those under a contract. Section 778.102 indicates that where an employer pays overtime

34

compensation for hours in excess of eight per day (not required by the FLSA) or for work on holidays (not required by the FLSA) (*i.e.*, where an employer undertakes obligations in excess of the FLSA), the FLSA does not require the employer to count these hours towards the FLSA overtime threshold. Indeed, Section 778.102 explicitly provides, "If no more than the maximum number of hours prescribed in the Act are *actually worked* in the workweek, overtime compensation . . . need not be paid." *Id.* (emphasis added). Section 778.102 addresses contractual obligations separately, and indicates that the FLSA does not abridge those contractual obligations. *Id.* (indicating that where an employer assumes an obligation to pay above and beyond the FLSA requirements, the FLSA will not "relieve an employer of any obligation he may have assumed by contract or of any obligation imposed by other Federal or State law to limit overtime hours of work or to pay premium rates for work in excess of a daily standard or for work on Saturdays, Sundays, holidays, or other periods outside of or in excess of the normal or regular workweek or workday").

Nowhere, however, does Section 778.102 indicate that in determining the number of hours worked for purposes of the FLSA, an employer looks to its contractual obligations. To the contrary, Section 778.102 seems to suggest that an employer's contractual undertakings do not have impact on its FLSA obligations and that those contracts do not transform hours paid but not worked into hours actually worked.

Although Sections 778.101 and 778.102 indicate that an employer does not look to the contract to determine whether hours paid but not worked are counted towards FLSA overtime thresholds, Section 778.320 of Title 29 implies the reverse. Section 778.320, however, is distinguishable. Section 778.320 provides in relevant part,

In some cases an agreement provides for compensation for hours

35

spent in certain types of activities which would not be regarded as working time under the Act if no compensation were provided. Preliminary and postliminary activities and time spent in eating meals between working hours fall in this category. *The agreement of the parties to provide compensation for such hours may or may not convert them into hours worked, depending on whether or not it appears from all the pertinent facts that the parties have agreed to treat such time as hours worked. . . . [T]he agreement of the parties will be respected, if reasonable.*

(a)  Parties have agreed to treat time as hours worked.  Where the parties have reasonably agreed to include as hours worked time devoted to activities of the type described above, payments for such hours will not have the mathematical effect of increasing or decreasing the regular rate of an employee if the hours are compensated at the same rate as other working hours.  The requirements of section 7(a) of the Act will be considered to be met *where overtime compensation at one and one-half times such rate is paid for the hours so compensated in the workweek which are in excess of the statutory maximum.*

29 C.F.R. § 778.320.  Section 778.320 addresses the situation where an employee is conducting preliminary or postliminary matters, or is eating lunch between working hours, that normally would not be considered work under the FLSA.  Where an employer agrees to pay the employee for this time, Section 778.320 indicates that the agreement will be respected and the hours will be treated as hours worked under the FLSA.

The hours spent by employees conducting preliminary and postliminary activities, or eating meals between working hours, are distinguishable in kind from hours spent by employees while on vacation or sick leave.  Hours in the former categories are work related.  In contrast, hours spent by an employee on vacation or sick leave are not work related.  Accordingly, while an agreement may bind an employer to count certain hours spent in (work-related) preliminary or postliminary activities towards the statutory overtime threshold, a CBA indicating that for purposes of the FLSA (vacation or sick leave) hours paid but not worked will be considered time

36

worked will not bind an employer to count those hours towards the statutory overtime threshold.

The Court further notes that counting hours paid for vacation or sick time towards the statutory overtime threshold is inconsistent with the policy behind the FLSA. "The principal congressional purpose in enacting the Fair Labor Standards Act of 1938 was to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions that are detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.'" *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 740 (1981) (quoting 29 U.S.C. § 202(a)). The overtime provisions of the FLSA were intended "to compensate those who labored *in excess of the statutory maximum number of hours* for the wear and tear of extra work and to spread employment through inducing employers to shorten hours because of the pressure of extra cost." *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 460 (1948) (emphasis added); *see also Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 40 (1944) (the "Congressional purpose in enacting § 7 (a) was . . . to compensate employees for the burden of a workweek *in excess of the hours fixed in the Act*") (emphasis added).

The FLSA was not intended to protect those who actually work only 40 hours per week, but are paid for an additional eight hours of vacation leave. That employee has still only actually worked 40 hours in a week, regardless of receiving the benefit of an additional eight hours of vacation pay. Certainly, the existence of the added benefit of eight (unworked) hours of vacation pay would not contribute to any oppressive working hours or labor conditions detrimental to the health, efficiency, and general well-being of workers. Nor would such added pay for unworked time create wear and tear of extra work on any given employee. Accordingly, the Court concludes that the policy behind the FLSA neither requires, nor is served by, the counting of

vacation or sick hours towards statutory overtime thresholds.[3]

The Court concludes that hours paid but not worked should not be counted towards the statutory overtime thresholds established by the FLSA.  The fact that a contract or CBA may provide that hours paid but not worked shall be counted as hours worked does not alter the Court's conclusion.[4]

B.    **Proving an FLSA Violation.**

At trial, Plaintiffs attempted to establish that the City failed to include the necessary add-ons and other required remunerations in its calculation of its employees' FLSA pay by producing pay stub and other wage information for four different employee-Plaintiffs.  These Plaintiffs also testified at trial in support of their claims that the City violated the FLSA.

1.    **Police Officers: Tyron Morgan and Todd Endres.**

Plaintiffs maintain that wage evidence for Tyron Morgan and Todd Endres demonstrates that the City failed to include the necessary add-ons and other remunerations in its calculation of FLSA overtime pay for City police officers.  The City argues that because it pays police officers after 40 hours under the CBAs, the contract pay is always higher than the FLSA pay, because FLSA is premised on a 43-hour overtime threshold instead of a 40-hour threshold.

---

[3] Although the preliminary and postliminary activities addressed in Section 778.320 are also not hours actually worked under the FLSA, those hours are work-related, even if only by the fact that the employees are present at their job site or they are eating meals between working hours.  Accordingly, the FLSA policy is better served by giving deference to an employment contract agreeing to count those hours towards statutory overtime thresholds.

[4] Although the Court has concluded that the City's failure to count hours paid but not worked towards the FLSA overtime threshold does not violate the FLSA, *see supra*, such a failure could violate a contract or CBA which specifically provides that the City must, for the purpose of computing overtime under the FLSA (as distinguished from computing overtime under the contract), consider paid leave as time worked.  That claim, however, is not before the Court, and the Court therefore expresses no opinion regarding the merits of such a claim.

At trial, Plaintiffs did not attempt to demonstrate that police officers' contractual wages were lower than their statutory wages paid pursuant to the 43-hour overtime threshold in Section 207(k) of the FLSA.  Rather, Plaintiffs argued that the City erroneously calculated statutory overtime based upon a 43-hour overtime threshold when it should have calculated statutory wages based upon a 40-hour threshold.  In support of their argument, Plaintiffs maintained first that the City failed to adopt a Section 207(k) work period and therefore was bound to pay pursuant to the 40-hour threshold established by Section 207(a), and second that the FLSA required the City to look to the CBAs--which provide for overtime after 40 hours--to determine the appropriate overtime threshold for police officers and firefighters.[5]

The Court addresses first whether the City properly adopted a Section 207(k) regime.  A state or local government, in its employment of law enforcement or fire protection personnel, may choose to conform to the 40-hour overtime threshold contained in Section 207(a)(1), or, the governmental entity may adopt an alternative scheme available under Section 207(k).  In enacting Section 207(k), "'Congress recognized that certain jobs are not easily susceptible to the workweek method of wage and time calculations, and therefore provided special calculation methods for some trades, including fire protection and law enforcement.'"  *Lamon v. City of Shawnee*, 972 F.2d 1145, 1150 (10th Cir. 1992) (citing *Wethington v. City of Montgomery*, 935

---

[5] Plaintiffs argue that the City refuses to include add-ons and nondiscretionary bonuses in calculating police officers' FLSA overtime wage based upon an express provision in the CBAs purportedly waiving calculation of the "regular rate" under the FLSA in exchange for contractual benefits.  Although the City concedes that it does not conduct a dual calculation for police officers, the City does not justify its decision on the ground that police officers have waived that right, perhaps because it is clear that an employer may not contract out of the minimum requirements of the FLSA.  Rather, the City maintains that because it pays contractual overtime after 40 hours, contractual pay always exceeds overtime pay.  The City contends that it therefore meets all FLSA requirements and need not calculate overtime pursuant to the FLSA.

F.2d 222, 224 (11th Cir. 1991)).  Section 207(k) provides,

> No public agency shall be deemed to have violated subsection (a) of this section with respect to the employment of any employee in fire protection activities or any employee in law enforcement activities . . . if--
>
> (1)    in a work period of 28 consecutive days the employee receives for tours of duty which in the aggregate exceed the lesser of (A) 216 hours, or (B) the average number of hours (as determined by the Secretary pursuant to section 6(c)(3) of the Fair Labor Standards Amendments of 1974) in tours of duty of employees engaged in such activities in work periods of 28 consecutive days . . . ; or
>
> (2)    in the case of such an employee to whom a work period of at least 7 but less than 28 days applies, in his work period the employee receives for tours of duty which in the aggregate exceed a number of hours which bears the same ratio to the number of consecutive days in his work period as 216 hours (or if lower, the number of hours referred to in clause (B) of paragraph (1)) bears to 28 days,
>
> compensation at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(k).

Pursuant to 29 C.F.R. § 553.201, the Secretary of Labor has established that 171 hours is the maximum number of hours a law enforcement officer may work in a work period of 28 days before the officer must be paid an overtime wage.  *Lamon*, 972 F.2d at 1150 (citing 29 C.F.R. § 553.230)).  Accordingly, in a 28-day period, Section 207(k) permits a law enforcement employer to pay its police officers a regular wage for the first 171 hours worked, but then compels an overtime wage for work in excess of 171 hours.  The number of hours at the regular and overtime wage rates for periods of fewer than 28 days would be calculated applying the same proportion, as explained in 29 C.F.R. § 553.230.  *Id.* (citing *Lee v. Coahoma County*, 937 F.2d 220, 224 (5th Cir. 1991)).  In the case of a seven-day work period, that proportion works out to

43 hours. *O'Brien v. Town of Agawam*, 350 F.3d 279, 290 (1st Cir. 2003) (citing 29 U.S.C. §
207(k) and 29 C.F.R. §§ 553.230(b), (c)).

It is the City's burden to establish by a preponderance of the evidence that its overtime
obligations with respect to police officers are governed by Section 207(k) instead of Section
207(a). *Lamon*, 972 F.2d at 1153-54. Specifically, the City need only show that the employees
in question are engaged in "law enforcement" or "fire protection" activities within the meaning
of Section 207(k), and that the City has adopted a qualifying "work period." Once these factual
criteria are established, the employer can simply start paying its employees under Section
207(k); the employees' approval is not required. *Barefield v. Village of Winnetka*, 81 F.3d 704,
710 (7th Cir. 1996); *O'Brien*, 350 F.3d at 290-91.

FLSA regulations define an employee in law enforcement activities as follows:

> any employee (1) who is a uniformed or plainclothed member of a
> body of officers and subordinates who are empowered by State
> statute or local ordinance to enforce laws designed to maintain
> public peace and order and to protect both life and property from
> accidental or willful injury, and to prevent and detect crimes, (2)
> who has the power to arrest, and (3) who is presently undergoing
> or has undergone or will undergo on-the-job training and/or a
> course of instruction and study which typically includes physical
> training, self-defense, firearm proficiency, criminal and civil law
> principles, investigative and law enforcement techniques,
> community relations, medical aid and ethics.

29 C.F.R. § 553.211(a). FLSA regulations further provide, "Typically, employees engaged in
law enforcement activities include city police; district or local police, sheriffs, under sheriffs or
deputy sheriffs who are regularly employed and paid as such; court marshals or deputy marshals;
constables and deputy constables who are regularly employed and paid as such; border control
agents; state troopers and highway patrol officers." *Id.* § 553.211(c). The Court concludes that
the City has demonstrated by a preponderance of the evidence that the police officer Plaintiffs

are engaged in law enforcement activities within the meaning of Section 207(k) of the FLSA.

To establish a Section 207(k) regime, the City also must demonstrate that it has adopted a qualifying work period. FLSA regulations provide that a qualifying work period is

> any established and regularly recurring period of work which, under the terms of the Act and legislative history, cannot be less than 7 consecutive days nor more than 28 consecutive days. Except for this limitation, the work period can be of any length, and it need not coincide with the duty cycle or pay period or with a particular day of the week or hour of the day. Once the beginning and ending time of an employee's work period is established, however, it remains fixed regardless of how many hours are worked within the period. The beginning and ending of the work period may be changed, provided that the change is intended to be permanent and is not designed to evade the overtime compensation requirements of the Act.

*Id.* § 553.224(a). The work period requirement is not a high hurdle. Virtually any bona fide, fixed, recurring period of between seven and 28 days will suffice. *O'Brien*, 350 F.3d at 291 n.21 (citing 29 C.F.R. § 553.224(a)). "[T]he work period need not even reflect the actual practice of overtime calculation between the parties, if the employer announces a qualifying work period but chooses to pay its employees more generously." *Id.* (citations omitted). Nevertheless, if the employer fails to announce and take bona fide steps to implement a qualifying work period, the ordinary overtime provisions of Section 207(a) will apply. *Id.*

The City has presented evidence that it adopted a seven-day work period, consisting of either five eight-hour or four ten-hour days. Pls' Exh. 7A, § 30(A); *id.* § 30(B)(1). The City also presented evidence that it explicitly adopted a Section 207(k) work period. Specifically, the City entered into various CBAs with its police officers in which the parties agreed that "[u]nder 7K of the FLSA, . . . for the purpose of computing overtime, the pay schedule will be a 7-consecutive-day, 40-hour workweek." *Id.* § 34; *cf. Franklin v. City of Kettering*, 246 F.3d 531, 536 (6th Cir.

42

2001) (finding the existence of a Section 207(k) work period and noting that evidence showed "that the patrol officers were aware of the work period," because they "entered into an agreements with the city regarding the compensation paid to canine officers which referenced the twenty-eight day work period"). The Court concludes that based upon the evidence before it the City has satisfied its burden of demonstrating that it has adopted a bona fide work period under Section 207(k) of the FLSA for police officers. *Cf. id.* at 536. Accordingly, the overtime threshold for police officers is 43-hours per week as opposed to 40-hours per week.

The Court next turns to Plaintiffs' second argument that the City was required to pay overtime under the FLSA after 40 hours, instead of 43 hours, because the City agreed to pay overtime after 40 hours in the CBAs and had a long-standing practice of paying overtime after 40 hours. This argument does not have merit. Once the City converted to a Section 207(k) regime, by meeting the requirements discussed herein, the City could not be deprived of the benefits conferred by subsection (k) simply because it agreed to pay officers overtime after 40 hours in its CBAs or because it has a long-standing arrangement to pay officers overtime after 40 hours. *Cf. Lamon*, 972 F.2d at 1151-52.[6]

In *Lamon v. City of Shawnee*, the Tenth Circuit affirmed the district court's decision denying the plaintiffs' renewed motion for summary judgment on the issue of the city's failure to establish a bona fide 28-day/171-hour work period under Section 207(k). *Id.* at 1151. The plaintiffs argued that the evidence did not show that the city established a Section 207(k) work

---

[6] Although in *Lamon v. City of Shawnee*, the City of Shawnee did not have an contractual agreement to pay its employees overtime after 40 hours, but rather simply a practice of paying employees overtime after 40 hours, this difference is of no consequence. The case simply stands for the proposition that an employer adopting a Section 207(k) regime need not pay pursuant to that regime in order to receive the benefits of that Section.

period because the compensation and scheduling practices under the alleged new Section 207(k) system were no different from those under the old Section 207(a) system. *Id.* Specifically, plaintiffs pointed out that despite the institution of a 28-day work period, the city continued to pay its law enforcement personnel every two weeks and to pay overtime for hours worked in excess of 40 hours per week. *Id.* The Tenth Circuit noted, however, that the plaintiffs had failed to cite "any authority supporting the contention that an employer, once having elected the subsection (k) option, must structure pay periods to be co-extensive with the chosen work period and may pay overtime only for hours worked beyond the legal maximum permitted at the regular wage." *Id.* The Tenth Circuit explained that "this contention flies in the face of the federal regulations promulgated under FLSA," which state in part that a "'work period' refers to any established and regularly recurring period of work, which . . . . cannot be less than 7 consecutive days nor more than 28 consecutive days," and that except for this limitation, "can be of any length, and . . . need not coincide with the duty cycle or pay period." *Id.* at 1151-52 (citing 29 C.F.R. § 553.224(a). The *Lamon* court further noted that the FLSA regulations "make[] no mention of a requirement that overtime wage rates be paid only for hours exceeding 171 in a work period." *Id.* at 1152.

Although in *Lamon*, the City of Shawnee did not have an contractual agreement to pay its employees overtime after 40 hours, but rather simply a practice of paying employees overtime after 40 hours, this difference is of no merit. The case simply stands for the proposition that an employer adopting a Section 207(k) regime need not pay pursuant to that regime in order to receive the benefits of that Section.

Having rejected Plaintiffs' arguments that the City was required to pay FLSA overtime after 40 hours, and having concluded that the City may calculate FLSA overtime after 43 hours

44

pursuant to Section 207(k), the Court next must determine whether Plaintiffs presented any evidence at trial demonstrating that the City underpaid its police officer employees in violation of the FLSA.

It is undisputed that Mr. Morgan's pay stub for the pay period ending May 17, 2002, does not reflect an overtime pay rate that includes the required add-ons under the FLSA. This fact alone, however, does not satisfy Plaintiffs' burden of demonstrating that the City underpaid Mr. Morgan when it did not include the required add-ons in calculating the regular rate of pay under the FLSA. In fact, because the City does not even contend that the pay stub reflects an FLSA calculation (indeed, the City admits that it does not undertake an automated FLSA calculation for police officers), the pay stub is not probative of the question whether the City violated the FLSA by underpaying Mr. Morgan when it failed to include the required add-ons in calculating the FLSA regular rate of pay.

To the contrary, Mr. Morgan's pay stub for the pay period ending May 17, 2002, indicates that the City paid Mr. Morgan more than required under the FLSA. The Court already has found that the FLSA pay of $3,491.26 to which Mr. Morgan would have been entitled for this pay period is $75.15 less than the contractual gross earnings of $3,566.41 that the City paid Mr. Morgan for that pay period. Mr. Morgan's wage information for the pay period ending July 6, 2007, also indicates that the City paid Mr. Morgan more than required by the FLSA. The FLSA pay of $3,229.03 to which Mr. Morgan would have been entitled for this pay period is $45.80 less than the $3,274.83 in contractual gross earnings that the City paid Mr. Morgan.

Plaintiffs have fared no better with respect to Mr. Endres. The FLSA pay of $2,415.68 to which Mr. Endres would have been entitled for the pay period ending December 15, 2000, is $148.60 less than the $2,564.28 in contractual gross earnings that the City paid Mr. Endres for

45

this same pay period.

At trial, Plaintiffs were required to establish an FLSA violation with respect to the City's payment of its police officers.[7]  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946) ("An employee who brings suit . . . for unpaid minimum wages or unpaid overtime compensation . . . has the burden of proving that he performed work for which he was not properly compensated." ); *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999) ("Nonetheless, an FLSA plaintiff must prove by a preponderance of evidence that he or she "performed work for which he [or she] was not properly compensated.") citing *Anderson*, 328 U.S. at 686-87).  *Compare Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974) ("The general rule [is] that the application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense on which the employer has the burden of proof."); *Spradling v. City of Tulsa, Okla.*, 95 F.3d 1492, 1499 (10th Cir. 1996) ("FLSA case law is clear that the employer bears the burden of demonstrating its right to an exemption.").  Plaintiffs failed to do

---

[7] Plaintiffs argue that it was the City's burden to justify exclusions from its "regular rate" calculations, and that the City has failed to present any evidence concerning its exclusion of these add-on payments.  Although Plaintiffs are correct that it is the City's burden of proof to justify an exclusion of remuneration from its "regular rate" calculations, *Baker v. Barnard Constr. Co.*, 146 F.3d 1214, 1217 (10th Cir. 1998) (citations omitted); *see also Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 209 (1966) (it is the employer's burden to justify a 29 U.S.C. § 207(e) exclusion of payments from the regular rate of compensation), Plaintiffs' argument misses the mark.  The City is not claiming that it may exclude add-ons such as longevity or superlongevity pay from its calculation of the FLSA "regular rate."  To the contrary, the City does not appear to dispute the fact that the FLSA requires the City to include these types of remunerations.  Rather, the City maintains that even if it were to include these add-ons, contract pay would nonetheless exceed statutory pay, making an FLSA calculation unnecessary.  *Cf. Franklin v. City of Kettering*, 246 F.3d 531, 536 (6th Cir. 2001) (finding no FLSA violation where the defendant offered uncontested "evidence showing that it calculated the overtime compensation due to its patrol officers under the CBA and under the FLSA and concluded that in every case, payment under the terms of the CBA equaled or exceeded that due under the terms of the FLSA").

so.  Accordingly, the Court concludes that Plaintiffs have failed to satisfy their burden of

demonstrating that the City violated the FLSA by paying Mr. Morgan, Mr. Endres, or any other

police officer an amount less than the FLSA required or by failing to include the required add-

ons in violation of the FLSA.  Therefore, the Court finds in favor of the City on Plaintiffs' claim

that the City pays its police officers overtime in violation of the FLSA.

2.    <strong><u>Fire Department Employees:  Patrick Chavez</u></strong>.

Having concluded that Plaintiffs have failed to establish a violation of the FLSA with

respect to employees of the City of Albuquerque Police Department, the Court next must

determine whether Plaintiffs have established a violation of the FLSA with respect to other City

employees.  In support of their claims at trial, Plaintiffs presented the pay stub of City employee

Plaintiff Patrick Chavez, a lieutenant employed by the City of Albuquerque Fire Department.

The City maintains that Section 207(k) governs its overtime payments for non-exempt

fire fighters.  To establish the existence of a Section 207(k) regime for fire fighters, the City

must show that the employees in question are engaged in "fire protection" activities within the

meaning of Section 207(k), and that the City has adopted a qualifying "work period."  FLSA

regulations define "fire protection" activities as follows:

> any employee (1) who is employed by an organized fire
> department or fire protection district; (2) who has been trained to
> the extent required by State statute or local ordinance; (3) who has
> the legal authority and responsibility to engage in the prevention,
> control or extinguishment of a fire of any type; and (4) who
> performs activities which are required for, and directly concerned
> with, the prevention, control or extinguishment of fires, including
> such incidental non-firefighting functions as housekeeping,
> equipment maintenance, lecturing, attending community fire drills
> and inspecting homes and schools for fire hazards.

29 C.F.R. § 552.210(a).  The Court concludes that the City has demonstrated by a preponderance

47

of the evidence that the fire fighter Plaintiffs are engaged in fire protection activities within the meaning of Section 207(k) of the FLSA.

The Court also concludes that the City has demonstrated by a preponderance of the evidence that the City has adopted a qualifying work period.  Ms. Chappell testified that the work period for fire fighters is "a 24-day, 182-hour period," which is contained in the payroll system.  Although unlike the CBAs for police officers, the fire fighters' CBAs do not include a specific provision indicating that the parties agreed to adopt a Section 207(k) work period, the threshold for establishing a qualifying work period is low and virtually any bona fide, fixed, recurring period of between seven and 28 days will suffice.  *O'Brien*, 350 F.3d at 291 n.21 (citing 29 C.F.R. § 553.224(a)).  Plaintiffs presented no evidence to counter Ms. Chappell's testimony, and the Court therefore concludes that the City adopted a qualifying Section 207(k) work period.

Even if, however, the City had not satisfied its burden of establishing a Section 207(k) work week, the Court nonetheless would conclude that Plaintiffs have failed to establish that the City violated the FLSA by underpaying its fire fighters in violation of the FLSA.  The City  paid Mr. Chavez $3,951.06 in gross contractual earnings for the pay period ending June 8, 2007.  The Court already found that the FLSA pay of $3,946.35 (which is based on a 40-hour work week under Section 207(a)) to which Mr. Chavez would have been entitled for the pay period ending June 8, 2007, is $4.71 less than the $3,951.06 in contractual gross earnings.  Accordingly, the Court concludes that Plaintiffs have not satisfied their burden of demonstrating that the City violated the FLSA either by paying Mr. Chavez or any other fire fighter an amount less than the FLSA required or by failing to include the required add-ons in violation of the FLSA.

3.     **Other Employees:  Alvin Cartwright.**

At trial, Plaintiffs tried to show that the City violated the FLSA by paying Alvin Cartwright, a former corrections officer employed by the City, less than the FLSA required.  For the pay period ending May 17, 2002, the City paid Mr. Cartwright $1,724.91 in gross earnings. The Court already has found, however, that the FLSA pay of $1,663.96 to which Mr. Cartwright would have been entitled for that pay period is $60.95 less than the $1,724.91 in gross earnings (and $57.68 less than the $1,721.64 in contractual gross earnings[8]) that the City paid Mr. Cartwright.

Likewise, Plaintiffs failed to show that the City paid Mr. Cartwright an amount less than required by the FLSA for the pay period ending July 8, 2005.  The FLSA pay of $2,329.96 to which Mr. Cartwright would have been entitled for this pay period is $20.96 less than the gross earnings of $2,350.92 (and $15.04 less than the contractual gross earnings of $2,345.00[9]) that the City paid Mr. Cartwright for this pay period.

The Court therefore concludes that Plaintiffs have not satisfied their burden of demonstrating that the City violated the FLSA either by paying Mr. Cartwright an amount less than the FLSA required or by failing to include the required add-ons in violation of the FLSA. Accordingly, the Court finds in favor of the City on Plaintiffs' claim that the City pays its

---

[8] For the pay period ending May 17, 2002, the City paid Mr. Cartwright $1,724.91 in gross earnings, which included a $3.27 FLSA adjustment.  Therefore, Mr. Cartwright's contractual gross earnings were $1,721.64 (*i.e.*, $3.27 less than his FLSA pay of $1,724.91).

[9] The City paid Mr. Cartwright $2,350.92 in gross earnings, which included a $5.92 FLSA adjustment.  Therefore, Mr. Cartwright's contractual gross earnings were $2,345.00 (*i.e.*, $5.92 less than his FLSA pay of $2,350.92).

employees overtime in violation of the FLSA.[10]  The Court further concludes that Plaintiffs'

claims on this question should be dismissed with judgment entered in favor of the City.

C.    **Skill Pay and Vacation Buy-Back Pay.**

Plaintiffs also argue that the City excludes "skill pay," which the City pays for additional

qualifications and educational attainments, and leave sell-back pay, which the City pays for

unused accrued sick leave and vacation time, from its calculation of the FLSA regular rate of

pay.  The only evidence Plaintiffs presented at trial to support their claim regarding skill pay was

the testimony of Plaintiff Patrick Chavez.  Mr. Chavez testified that in 1992 or 1993, he

questioned the union why the City was not including his paramedic skill pay in his overtime

hourly rate of pay.  Mr. Chavez indicated that union representatives informed him that they were

going to look into his question and discus it with him.  According to Mr. Chavez, the issue was

not addressed or changed.

The Court already has concluded that the fact a pay stub fails to reflect that an add-on,

such as skill play, was included in an employee's overtime hourly rate alone is insufficient to

establish as a matter of law that the City underpaid that employee in violation of the FLSA.  *See*

*supra* pp. 45.  The pay stubs of the City's employees represent the City's contractual (not

---

[10] Plaintiffs' argument that the City is required to count towards the FLSA overtime threshold hours paid but not worked fails with respect to employees covered by the contracts between the City and the New Mexico Transportation Union for a second reason.  The basis for Plaintiffs' argument is that the CBAs require the City to count hours paid but not worked as hours worked towards both the contractual and statutory overtime hours thresholds, and that failure to look to the CBAs to determine what hours count towards statutory overtime thresholds violates the FLSA.  The contracts between the City and the Transportation Union employees, however, do not contain a provision indicating that for purposes of computing overtime paid leave *will* be considered time worked.  They simply state that paid leave *may* be counted as hours worked under limited circumstances when that leave is taken for Union business.  Accordingly, any Plaintiffs governed by these CBAs cannot argue that the contracts require the City to count hours paid but not worked towards statutory overtime thresholds.

statutory) calculation of its employees' wages. *See supra* p. 45  Accordingly, the hourly overtime wage for any City employee will never include add-ons such as skill pay. *See supra* p. 45. In the absence of any evidence indicating that the City's FLSA calculation itself failed to include the required skill-pay add-on, and that this failure resulted in the City underpaying Mr. Chavez under the FLSA, the Court cannot make any finding in Plaintiffs' favor.

Plaintiffs also contend that the City does not include leave sell-back pay in its FLSA calculations of the "regular rate" of pay.  The evidence presented at trial indicates that employees of the Albuquerque Police and Fire Departments are able to sell their sick leave and vacation pay back to the City, and that the City of Albuquerque does not include this buy back pay in the calculation of the employees' FLSA overtime rate of pay.  Patrick Chavez testified that when the City buys back excess leave, it simply gives its employees checks.  The payment is not added to employee pay stubs and is not included in calculating the regular rate of pay under the FLSA.  Moreover, Ms. Chappell conceded that the City does not include vacation or sick leave buy back pay in its calculation of the regular rate under the FLSA.

At trial, the City conceded that it does not include vacation or sick leave buy back pay in its calculation of the regular rate under the FLSA.  As such, no factual question exists, and if the Court determines as a matter of law that this type of pay is remuneration under the FLSA, Plaintiffs will have satisfied their burden of demonstrating an FLSA violation.[11]

---

[11] In contrast, the Court needed to undertake a factual determination with respect to the question whether the City properly includes add-ons such as longevity and superlongevity pay in its calculate of the FLSA "regular rate."  Such a finding was necessary because the parties disputed whether the City included those add-ons.  While Plaintiffs maintained that the pay stubs in evidence demonstrated that the City failed to include the add-ons in its FLSA overtime rate, the City maintained that it included all of the necessary add-ons, but that the pay stubs did not reflect these add-ons in the hourly overtime rate.  Rather, where FLSA pay exceeded contract pay, the City paid its employee the difference in the form of a one line item FLSA adjustment.

Section 207(e) of the FLSA provides, in relevant part, that "all remuneration for employment paid to, or on behalf of, the employee" must be included in the employee's regular rate of pay, provided such remuneration is not prohibited by one of eight statutory exclusions listed under § 207(e)(1)-(8). 29 U.S.C. § 207(e). There is a statutory presumption "that remuneration in any form is included in the regular rate calculation. The burden is on the employer to establish that the remuneration in question falls under an exception." *Madison v. Res. for Human Dev. Inc*., 233 F.3d 175, 187 (3d Cir. 2000); *see also Baker v. Barnard Constr. Co.*, 146 F.3d 1214, 1217 (10th Cir. 1998) (It is the City's burden to justify the exclusion of payments from the FLSA's regular rate calculation) (citations omitted).

In *Acton v. City of Columbia*, the Eighth Circuit addressed the same question before this Court: whether vacation and sick leave buy back pay is remuneration includable in the FLSA regular rate calculation. 436 F.3d 969, 977 (8th Cir. 2006). The *Acton* court looked to Section 778.223 of Title 29 of the Code of Federal Regulations for guidance, because the regulation addresses the scope of Section 207(e)(2). *See id.* Specifically, Section 778.223 addresses whether monies paid to employees for remaining on call are excluded from the regular rate under Section 207(e)(2). *Id.* "The regulation concludes that monies paid to employees to remain on call, while not related to 'any specific hours of work,' are nevertheless awarded as 'compensation for performing a duty involved in the employee's job'--namely, the employee's willingness and commitment to work unscheduled hours if requested. *Id.* (citing 29 C.F.R. §

---

In many cases, the City argued that no FLSA adjustment was necessary because contract pay exceeded FLSA pay. Based upon these arguments, the Court was required to undertake a comparison of contract and FLSA pay to determine whether the City failed to consider the required add-ons in calculating FLSA pay. With respect to vacation and sick leave sell back pay, however, the Court need not undertake this analysis because the City concedes that it never includes this type of pay in its calculation of the FLSA regular rate.

778.223).  "The plain language of the regulation makes clear that all monies paid as compensation for either a general or specific work-related duty should be included in the regular rate.  The critical question . . . is whether sick leave buy-back monies compensate the firefighters for some specific or general duty of employment."  *Id.*

The *Acton* court concluded that payments awarded to employees for not using accrued sick or vacation leave, which necessarily requires those employees to have worked more days than required, is tantamount to payment for services rendered and therefore is remuneration that must be included in the calculation of the FLSA regular rate of pay.  *Id.* at 979.  In addition, the *Acton* court explained that buy back is remuneration because

> [i]n order to qualify for sick leave buy-back payments, firefighters must come to work regularly for a period of several years in order to amass the requisite six month sick leave reserve. . . .  Thus, the primary effect of the buy-back program is to encourage firefighters to come to work regularly over a significant period of their employment tenure.  We recognize consistent workplace attendance to be a general duty of employment and, therefore, rule that sick leave buy-back monies constitute remuneration for employment.

*Id.*

The Court finds the reasoning of *Acton* persuasive.  The vacation and sick leave buy back pay here is likewise awarded to employees who have necessarily worked more days than required, and, as such, it also is tantamount to payment for services rendered.  Moreover, as in *Acton*, in order to qualify for leave buy back pay, employees must have worked for a period of time sufficient to accumulate a certain amount of leave.  The CBAs between the City and the Firefighters' Union provide, for example, that Fire Department employees "who have accumulated over two years vacations may convert up to six (6) days over the two-year accumulation to cash payment once per calendar year."  Likewise, with respect to sick leave, the

53

CBAs provide that employees on a 56-hour workweek who have accumulated over 700 hours may convert their sick leave hours on the basis of three hours of sick leave for one hour of pay, that employees on a 56-hour workweek who have accumulated over 1008 hours may convert their sick leave hours on the basis of two hours of sick leave for one hour off pay, and that employees on a 56-hour workweek who have accumulated over 1400 hours may convert their sick leave hours on the basis of three hours of sick leave for two hours of pay.

The Court also agrees that the payments here for unused vacation and sick leave do not resemble the types of payments excludable from the regular rate under Section 207(e). In *Acton*, the court explained that payments excluded from the regular rate under Section 207(e)(2) must "be 'similar' in character to the payments specifically described" in (e)(2). *Id.* at 977 n.10 (citing 29 C.F.R. § 778.224(a)). The *Acton* court concluded that "[s]ick leave buy-back monies, in contrast to § 207(e)(2) payments, are awarded to employees for coming to work consistently, not for work that was never performed." *Id.* at 977. This Court agrees.

For these reasons, the Court concludes that vacation and sick leave buy back pay is remuneration that must be included in the calculation of the FLSA regular rate of pay. The City concedes that it does not include this type of pay in its FLSA calculation, and the Court concludes that the City is in violation of Section 207 of the FLSA. Accordingly, the Court finds in favor of Plaintiffs and against the City on this question.

II.    **Credits.**

The second question presented to the Court a trial was whether the City properly credits payments against its FLSA overtime liabilities. The City argues that it only takes credits for premium payments made under its union contracts. Plaintiffs, not surprisingly, maintain that the City takes credits and offsets against its overtime pay obligations for payments other than the

"premium" payments specified in Section 207(e)(5), (6), and (7).

Specifically, Plaintiffs argue that the City is taking "credits and offsets" for hours "paid but not worked. According to Plaintiffs, the City claims the right to take "credit" against unpaid overtime wages for hours of paid leave for which the City paid straight-time wages, as in a week when an employee was sick for a day but then worked an additional eight hours over the normal 40 hour week. Plaintiffs correctly maintain that straight-time wage payments may neither be excluded from the regular rate of pay nor credited against owed overtime as "premium pay." 29 U.S.C. §§ 207(e), (h).

As the Court has explained, however, Plaintiffs have not satisfied their burden of proof of presenting evidence at trial that the City has any FLSA liabilities that it is seeking to offset. For example, Plaintiffs have not presented any evidence of an employee whose FLSA pay exceeded his or her contractual pay. To the contrary, the wage information for Plaintiffs Morgan, Endres, Chavez, and Cartwright indicates that the City paid these individuals in excess of FLSA requirements. Without establishing that the City owed its employees FLSA pay above and beyond their contractual pay, Plaintiffs cannot establish that the City improperly credited premium payments to offset the monies it owed under the FLSA. Accordingly, the Court cannot find in Plaintiffs' favor on their claim that the City improperly takes credits or offsets against their FLSA liabilities.

For the foregoing reasons, Plaintiffs have not satisfied their burden of proof of demonstrating that the City improperly takes credits and offsets against its FLSA liabilities in violation of Section 207(e)(5), (6), and (7) of the FLSA. The Court therefore finds in the City's favor on these claims. The Court further concludes that Plaintiffs' claims with respect to improper credits and offsets should be dismissed with judgment entered in favor of the City.

## <u>CONCLUSION</u>

The Court finds in favor of Plaintiffs and against Defendant City with respect to Plaintiffs' claims that the City fails to include vacation and sick leave buy back in the calculation of the statutory "regular rate" of pay in violation of the FLSA's overtime pay requirements.  The Court finds against Plaintiffs and in favor of Defendant City with respect to all remaining claims in Plaintiffs' Second Amended Complaint for Violations of the Fair Labor Standards Act [Doc. 178].  These remaining claims are therefore dismissed with prejudice.  The Court will enter a Partial Judgment in this matter consistent with these Findings of Fact and Conclusions of Law.

**IT IS SO ORDERED.**

Dated this 17th day of January 2008.

JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE